UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCURATE GRADING QUALITY ASSURANCE, INC. and ELECTRONIC SALES DEALER NETWORK, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN R. THORPE and KGK JEWELRY LLC, <br><br> Defendants. | Civil Action No.:  12-cv-1343 (ALC) <br><br> AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES <br><br> Jury Trial Requested <br><br> ECF Case |

Plaintiffs ACCURATE GRADING QUALITY ASSURANCE, INC. ("aGQa") and

ELECTRONIC SALES DEALER NETWORK, INC. ("ESDN"), by the undersigned, as and for

their Amended Complaint against John R. Thorpe ("Thorpe") and KGK Jewelry LLC ("KGK"),

allege as follows:

### SUMMARY

1.      This action arises from John R. Thorpe's desertion and breach of the trust placed

in him by his employer and his business partners through misappropriating the Plaintiffs' trade

secrets and deploying them at Plaintiffs' competitor for his and KGK's own gain and at the

Plaintiffs' expense.

2.      Steve Yeko, the founder and leader of both aGQa and ESDN, has been in the retail

jewelry business for more than thirty years.

3.      During the mid-2000s, Steve Yeko began to see an opportunity to develop

software and other marketing products to bring the jewelry industry into the information age, and

formed aGQa for that purpose.

4.      Since then, he has built aGQa into one of the the leading software and marketing

companies serving the jewelry industry, through his own ingenuity, sweat equity and substantial

financial investment.

5.     Now, along with ESDN, aGQa has a robust suite of technological and marketing offerings that allow individual retailers to become their own jewelry brand, develop deeper relationships with their best customers, and reach out to new or less frequent customers, all while slashing overhead expenses at the same time as greatly expanding their merchandising.

6.     In their own press release, KGK described aGQa's and ESDN's integrated program as the "newest and most comprehensive," "unique," and "highly effective," stated that it gave its jewelry retailer users "a decisive competitive edge," and acknowledged that ESDN is "the industry's fastest-growing secure source for highly effective jewelry e-commerce solutions."

7.     In addition to the products and services they have already rolled out, and which were the subject of the above press release, aGQa and ESDN have many additional products and services that will further establish them as the leader in their industry, including some of which are ready for market and some of which are under development.

8.     Both current and under-development aGQa and ESDN offerings (the "aGQa/ESDN Core Offerings") are either based on the Plaintiffs' proprietary trade secrets or are themselves trade secrets, and are the central pillar of Plaintiffs' business and value.

9.     In addition to the trade secrets and other intellectual property at the heart of the aGQa/ESDN Core Offerings, both aGQa and ESDN must also focus on the proper execution of what the market has already determined are highly valuable ideas, products, and services.

10.     This execution itself involves many trade secrets and confidential information, such as what products and services to roll out first and how best to do so, what products and services to focus development efforts on first and how best to do so, what market segments to target first, what cash flow and ultimate return on investment might be expected, whether and to what extent to seek joint venture partnerships and other forms of mutually beneficial

collaboration, outsourcing development tasks.

11.     Further, aGQa and ESDN already enjoys several beneficial business relationships with major clients and partners, including retailers, wholesalers, and manufacturers, and many of these relationships and/or their particulars are confidential, provide great value to aGQa and ESDN, and would be severely devalued if known generally in the marketplace.

12.     In fact, the contractual bases for many of these relationships actually require that aGQa and ESDN maintain the confidentiality of their material terms.

13.     In addition to their inherent value, these trade secrets and confidential information are especially important given that aGQa and ESDN are competing in an arena where being "first to market" provides tremendous advantages that would be greatly diminished by the unlawful and unfair disclosure of aGQa's and ESDN's vital business information.

14.     The advantages of being first to market are not simply the natural result of being the first to conceive of the ideas, as aGQa and ESDN were, but come at tremendous cost and only after struggling through the difficulties of carving a new path.

15.     aGQa and ESDN were not immune to such difficulties, and have expended hundreds of thousands of dollars, thousands of work hours, and marshaled their proprietary resources to overcome them to become the market leaders they are today.

16.     To help with literally every aspect of all of the above, Steve Yeko brought in John Thorpe, who was a lawyer, a software engineer, and an entrepreneurial businessman.

17.     Thorpe was employed by aGQa, and subject to an Employment and Proprietary Information Agreement, which contains the following comprehensive confidentiality provision:

> Confidentiality.   I agree to keep confidential, except as the Company may otherwise consent in writing, and not to disclose, or make any use of except for the benefit of the Company, at any time either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data or other information of the Company relating to products, processes, know-how, designs,

formulas, test data, customer lists, business plans, marketing plans and strategies, and pricing strategies or other subject matter pertaining to any business of the Company or any of its clients, customers, consultants, licensees, or affiliates, which I may produce, obtain or otherwise acquire during the course of my employment, except as herein provided. I further agree not to deliver, reproduce or in any way allow any such trade secrets, confidential information, knowledge, data or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of the Company. My duty hereunder to maintain trade secrets, confidential information, knowledge and data in confidence shall only be relieved by written consent from Company, or by and only to the extent that any such trade secret, confidential information, knowledge and data shall become known in the industry through no direct or indirect fault of mine.

18.     Thorpe also agreed and acknowledged that all intellectual property created by him while he worked at aGQa, *including such creations beyond the scope of his employment* by aGQa but otherwise related to aGQa's business, would be a "work made for hire" or assigned to aGQa:

4. Creative Works and Copyrights

(a) I hereby agree and understand that any and all creative works (as used in this Agreement, "creative work" shall include, but not be limited to, literary, musical, dramatic, pictorial, graphic, sculptural, choreographic and audiovisual works as well as pantomimes, motion pictures, sound recordings, computer programs and software) prepared by me (solely or jointly with others) within the scope of my employment by the Company and during the period of my employment with the Company shall be and are "works made for hire" under the United States Copyright Act. Under the Copyright Act the Company is legally deemed to be the "author" of a "work made for hire," and no assignment or transfer from me to the Company of such creative work is required to place title to the same in the Company. With respect to foreign rights in creative works prepared as an employee within the scope of my employment by Company, I hereby assign and transfer, and agree to assign and transfer, to the Company my entire worldwide right, title and interest in and to all such works.

(b) To the extent that any creative work is not prepared within the scope of my employment by the Company, but relates to the business of Company or to Company's actual or demonstrably anticipated research or development, I hereby assign and transfer to the Company, and I agree to assign and transfer to the Company, my worldwide right, title and interest in and to any and all such creative works.

(c) I agree and understand that the Company, as owner and proprietor of any creative works covered by this Agreement, has the exclusive right to reproduce the creative work, prepare derivative works, distribute copies or photo records of

4

the creative work to the public by sale or rental, perform the creative work publicly and to display the creative work publicly.

19.     Thorpe also affirmatively declared that he had no right, title, or interest in any

creative works made or created by him prior to his employment by aGQa, and/or otherwise

waived any claims thereto:

> 8. Prior Inventions. It is understood that all inventions, if any, patented or unpatented, and creative works, whether registered copyrights or not, which I made prior to my employment by the Company, are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on Exhibit B attached hereto a complete list of all of my prior inventions and creative works, including numbers of all patents and patent applications, and a brief description of all unpatented inventions and unregistered copyrights which are not the property of a previous employer. I represent and covenant that the list is complete and that if no items are on the list, I have no such prior inventions or creative works. I agree to notify the Company in writing before I make any disclosure or perform any works on behalf of the Company which appear to threaten or conflict with proprietary rights I claim in any invention, idea or creative work. In the event of my failure to give such notice, I agree that I will make no claim against the Company with respect to any such inventions, ideas or creative works.

20.     Thorpe was deeply involved in and had a leadership role in virtually every single

aspect of aGQa and ESDN's business – he was since its founding, and remains, a major ESDN

shareholder, and was aGQa's chief software engineer – and was, as recently as September 2011,

privy to all of aGQa and ESDN's trade secrets and confidential information.

21.     All of aGQa and ESDN's ingenuity, hard work, and financial investment are

directly threatened by Thorpe's recent decision to capitalize on his insider knowledge of aGQa

and ESDN – which he cannot "unlearn" or ignore, and which he is contractually obligated to

protect – by joining KGK, aGQa's and ESDN's former client turned main competitor, in a

position virtually identical to his former position at aGQa.

22.     Indeed, Thorpe has already shown a willingness and intent to use his knowledge

of aGQa's and ESDN's proprietary and legally protected information for his own and KGK's

benefit, including aGQa's and ESDN's in-store "kiosk" package.

23.    In February 2012, several emails were sent by personnel in KGK's marketing department to Thorpe at his old jthorpe@esdn.com email address.  In the first, Thorpe and KGK were discussing KGK's "new kiosk," and the following image, with a placeholder at the bottom for an additional bar, was attached:



24.    This image, created by KGK and Thorpe working together, is virtually identical to, and infringes upon, the following legally protected image created by aGQa and ESDN under Thorpe's watch:



25.    In the second email, "Allison," using the email address kgkmarketing@optimum.net, wrote the following to Thorpe (emphasis in original):

John,

Just uploaded a folder called MISSING IMAGES 3.

With all the information sent to you today.

I believe the next missing list will be hopefully....under 10

A BIG THANKYOU FOR ALL YOUR HELP.

Allison

26.     This second email clearly shows an ongoing collaborative relationship between KGK and Thorpe, and that Thorpe's role at KGK, whatever its formal legal nature, is for all intents and purposes virtually identical to his key role at aGQa and ESDN, and that the purpose of the KGK-Thorpe collaboration is for Thorpe to replicate aGQa and ESDN's products and services.

27.     The KGK-Thorpe collaboration not only will inevitably lead to the disclosure and misappropriation of aGQa's and ESDN's trade secrets, both KGK and Thorpe have already engaged in such misappropriation and demonstrated that such misappropriation is the very purpose of their collaboration.

## PARTIES, JURISDICTION AND VENUE

28.     Plaintiff Accurate Grading Quality Assurance, Inc. is a software, technology and marketing company incorporated and existing under the laws of Wisconsin, with a principal place of business of 340 Midland Road, Suite 150, Janesville, WI 53546.

29.     Plaintiff Electronic Sales Dealer Network, Inc. is a marketing company incorporated and existing under the laws of Wisconsin, with a principal place of business of 340 Midland Road, Janesville, WI 53546.

30.     Defendant John R. Thorpe is an attorney admitted to practice law in Wisconsin (currently inactive) and residing at 900 Leland Ridge Road, Columbia, MO 65203.

31.     Defendant KGK Jewelry LLC is a New York Limited Liability Company comprised of the following five Members:

a.     Vinamra Kothari, who is domiciled in the State of New Jersey;

b.     KGK Holding Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018;

c.     KGK Properties USA Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018;

d.     KGK Creations USA Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018; and

e.     Unique Holding (US) Inc., a corporation organized under the laws of Delaware, with its principal place of business located at 36 West 44th Street, 13th Floor, New York, NY 10036.

32.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), and 1367. Plaintiffs allege claims for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, and for related common law and state law claims of misappropriation of Plaintiffs' trade secrets and other confidential information, unfair competition, unjust enrichment, and breach of contract.

33.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(a), as a substantial part of the events giving rise to this action occurred in this District, and Defendants may be found in this District.

## PRIOR PROCEEDINGS IN THIS ACTION

34.     After serving and filing their original Complaint, the Plaintiffs moved for a temporary restraining order and preliminary injunction. In connection with that Motion, the Plaintiffs filed a "Declaration of Steve Yeko In Support of Plaintiffs' Motion for Preliminary Injunction" (Docket No. 15) (the "Yeko Declaration"). The Plaintiffs incorporate by reference and allege each and every factual allegation set forth therein, including the documentary exhibits attached thereto but not including the documentary exhibits merely referenced therein, as though fully set forth herein.

35.     In opposition to Plaintiffs' Motion, Defendants Thorpe and KGK submitted a "Declaration of John Thorpe" (Docket No. 25). As per this Declaration, which John Thorpe executed under oath:

   a.     In or around late 2009, Yeko and Thorpe, along with another individual, Viet Nguyen ("Nguyen"), discussed the formation of ESDN as a company focused on providing electronic dealership services for the jewelry industry. The three of them – namely, Yeko, Nguyen and Thorpe – became investors and shareholders of ESDN, in which Thorpe received a 30% interest, Yeko a 56% interest, and Nguyen a 14% interest.

   b.     From the beginning, KGK was the main customer of ESDN. KGK contracted with ESDN to develop a kiosk (i.e., touch screen tablet computer) that provided real-time access to a retailer's entire inventory, including a "virtual inventory" of products, as well as supplier/manufacturer product information, pricing and images.

   c.     As of October 4, 2011, the AGQA/ESDN kiosk system was a completely functioning system that had been in the market for well over a year.

   d.     Thorpe continues to be a 30% shareholder of ESDN, and claims that he remains interested in helping the companies succeed in the off chance he might receive

9

some benefit from his stock ownership.

      e.     Prior to leaving AGQA/ESDN, Thorpe emailed Yeko about his thoughts regarding the best plan for growing the company. Thorpe argued that the most viable option was to eliminate all non-KGK products and business, and focus on delivering exactly what KGK needed since they were by far ESDN's largest client. Once that was achieved, Yeko could work to identify other companies that were in need of the same solutions that were already being provided to KGK.

      f.     Thorpe also claims that in an effort to ensure that KGK remained a good client of ESDN, of which he still owned 30%, upon his departure he called Allen Bloom, who worked with KGK in New York, and informed him that the best option for KGK was to continue doing business with ESDN. Other solutions would take too long, be much more expensive, and run the risk of not delivering the functions needed. Thereafter, KGK continued to conduct business with ESDN.

      g.     In or around late November 2011, Allen Bloom contacted Thorpe regarding a potential bid on a new jewelry venture that he was putting together with a Danish jewelry executive (the same Newco venture discussed at length in the Yeko Declaration). Thorpe discussed the opportunity with Allen Bloom, but alleges that at that point he was fully committed to the development of an internet cloud-based application hosting environment. Bloom continued to try to convince Thorpe to become involved and, on December 6, 2011, Thorpe agreed to meet with Bloom in New York to discuss the possible new business opportunity. Thorpe allegedly became interested because he believed he could use his new cloud-based system in this venture. As a result, I began working on some initial cost estimates for the new venture.

h.    In mid-December 2011, and allegedly after repeated prodding from Allen Bloom in New York, Thorpe agreed to and did help KGK take over the AGQA/ESDN kiosks already placed in approximately 70 retail locations around the country, including in New York. Thorpe alleges that he did this "in the interest of not spoiling future opportunities in possible new ventures," including the Newco venture described above and in the Yeko Declaration.

i.    Thorpe alleges that all of the raw data that was used in developing his replacement program for the kiosks was provided by KGK, including the raw format images, graphical designs and raw catalog data, and that KGK advised him that it was the sole owner of the raw data and images that it provided to him for the development project.

j.    Thorpe alleges that he traveled to New York no less than four times during the relevant period, including in connection with the business relationship between ESDN, of which he owns a significant portion, and in connection with the Newco venture described above and in the Yeko Declaration.

36.    In opposition to Plaintiffs' Motion, Defendants Thorpe and KGK also submitted a "Declaration of Allen Bloom" (Docket No. 25). As per this Declaration, which Allen Bloom executed under oath:

a.    John Thorpe is KGK's "replacement [for AGQA/ESDN] computer services vendor" who came "to KGK's rescue" when the relationship between AGQA/ESDN and KGK ended.

b.    Thorpe made significant contributions to AGQA/ESDN "as a prior employee and owner of the company."

c.    KGK retained Thorpe as an independent consultant to work on the kiosk system to replace the AGQA/ESDN system, and provided Thorpe with images to use,

which images Bloom alleges were owned by KGK.

      d.     KGK chose to shut down the AGQA/ESDN kiosk system in favor of the Thorpe/KGK replacement system even though the latter "did not have the full functionality of the system that ESDN developed."

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS

### (against all Defendants)

37.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

38.     The Plaintiffs possess numerous trade secrets relating to all aspects of their business, and Thorpe was privy to virtually of them, including but not limited to:

      a.     Thorpe, as a lawyer and software engineer by training, had a wide range of duties at the Plaintiffs, including marketing and product management.

      b.     Thorpe interacted with virtually every part of the Plaintiff companies, including sales, engineering, marketing, manufacturing and research and development.

      c.     Thorpe attended, initiated, and ran high level policy designing, marketing and financial meetings, both in person and by email.

      d.     Thorpe regularly interacted with the Plaintiffs' customers to obtain "feedback" and in connection with his other duties, including playing a major role in the Plaintiffs' relationship with KGK.

      e.     Thorpe's job included interpreting the Plaintiffs' market and its needs, and relating that to the Plaintiffs' products and services, including the deployment of resources to continually improve the Plaintiffs' offerings.

f.      Thorpe attended many jewelry industry trade shows, which are extremely important in the industry, and was methodically and purposely introduced to Plaintiffs' key customers, potential partners, and other business relationships.

g.      Thorpe interacted and worked closely with Steve Yeko, the majority owner of both aGQa and ESDN, and the driving force behind both companies, including if not especially on the creative and product and service development level.

h.      Thorpe was regularly a sounding board for Yeko with regard to all aspects of the Plaintiffs' business.

i.      Thorpe was also privy to information with regard to the Plaintiffs' working versions of the Plaintiffs' products and services, including development costs and pricing structure, training, release dates and the projected value of each individual offering as well as how each piece fit into the larger picture of the Plaintiffs' suite of products and services.

j.      As the relationship between the Plaintiffs and KGK deteriorated in the last half of 2011, Thorpe was also one of three or four key figures in managing that relationship, including how best to compete with KGK in the future, how to settle up the accounts between the Plaintiffs and KGK, and how to extract the most value out of the clearly faltering relationship.

k.      Thorpe was also the lead software engineer on all of aGQa's major software development projects, and, on information and belief, maintained a copy of the source code for that software on his personal laptop, which he retained after terminating his employment with aGQa in or about September 2011.

39.     This was confidential information not known to persons outside the Plaintiffs.

40. Thorpe gained his knowledge of the Plaintiffs' trade secrets and confidential information in a position of great trust, and subject to an Employment and Proprietary Information Agreement that he has now breached in order to cash in on his knowledge of every detail of Plaintiffs' business.

41. As described above, this trade secret and confidential information was known to only a handful of key trusted employees and company shareholders, and it was protected by the non-disclosure agreement executed by Thorpe.

42. KGK, for its part, has intentionally hired a person that it knows possesses a tremendous amount of proprietary information concerning the Plaintiffs, and has done so for the central purpose of attempting to duplicate the Plaintiffs' products and services, and do so via misappropriation of the Plaintiffs' trade secrets and confidential information.

43. The Plaintiffs expended a tremendous amount of human and financial resources to its product and service offerings, business strategy, and industry relationships, and the competitive advantage built up thereby will be severely undermined if Thorpe and KGK are allowed to continue to work together, with Thorpe assuming the same product development and marketing role in which he was employed by aGQa.

44. Through their misappropriation, both Thorpe and KGK will unfairly and unlawfully gain the "first to market" advantage for which the Plaintiffs have paid so dearly – in fact, that appears to be the very purpose of the Thorpe-KGK collaboration.

45. Even if Thorpe and KGK had not already made it clear that they plan to leverage Thorpe's insider knowledge of every aspect of the Plaintiffs' businesses, Thorpe's knowledge of the Plaintiffs is so engrained in him, and his position at KGK so similar to his position at the Plaintiffs, that unlawful disclosure of the Plaintiffs' trade secrets and confidential information is inevitable.

46.     The Defendants' conduct was, is, and remains willful and wanton, and was undertaken with blatant disregard for Plaintiffs' valid and enforceable rights.

47.     By reason of the foregoing, Defendants have been unjustly enriched and Plaintiffs have suffered irreparable harm as a result of the misappropriations of their trade secrets and confidential information, and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless Defendants, their agents, and all those acting in concert with them are enjoined from engaging in further acts of misappropriation.

48.     Plaintiffs are further entitled to recover from Defendants the damages Plaintiffs have sustained and will sustain as a direct result of Defendants' wrongful acts.  The amount of such damages cannot be precisely determined at this time, but is known to be in the millions of dollars.

49.     Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages Defendants have gained as a result of their wrongful acts.  Plaintiffs are at present unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their misappropriation of Plaintiffs' trade secrets and confidential information, but it is believed to be in the millions of dollars.

50.     By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but believed to be in the millions of dollars.

51.     Plaintiffs also reserve the right to see punitive and exemplary damages, and attorneys' fees, as a result of Defendants' willful and wanton conduct.

## SECOND CAUSE OF ACTION

### COPYRIGHT INFRINGEMENT AND CONTRIBUTORY COPYRIGHT INFRINGEMENT PURSUANT TO THE COPYRIGHT ACT

**(against all Defendants)**

52.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

53.     By means of the actions complained of above, pursuant to 17 U.S.C. § 501, Defendants have infringed and will continue to infringe Plaintiffs' copyright in, at the very least, the image set forth above, by accessing, manipulating, altering, using, or creating a derivative work from it without Plaintiffs' consent or authority in violation of 17 U.S.C. § 106.

54.     On information and belief, Thorpe retains a copy of the source code for all or most of the Plaintiffs' software offerings, and has been retained by KGK to duplicate same, including but not limited to the look and feel associated with the user experience effected by that code.

55.     Defendants' infringing conduct has caused and, unless restrained by this Court, will continue to cause Plaintiffs irreparable injury, for which Plaintiffs have no adequate remedy at law.

56.     Plaintiffs are entitled to an injunction restraining Defendants, their officers, agents, and employees, and all other persons acting in concert with them, from engaging in further such acts in violation of the federal copyright laws.

57.     Plaintiffs are further entitled to recover from Defendants the damages Plaintiffs have sustained and will sustain as a direct result of Defendants' wrongful acts.  The amount of such damages cannot be determined at this time.

58.     Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages Defendants have gained as a result of their wrongful acts.  Plaintiffs are at present

unable to ascertain the full extent of the gains, profits, and advantages Defendants have obtained by reason of their acts in violation of the federal copyright laws.

59.     By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial, but believed to be in the millions of dollars.

60.     Defendants are willfully engaged in, and are willfully engaging in, the acts complained of with oppression, fraud, and malice, and in conscious disregard of the rights of Plaintiffs.  Defendants' infringing actions are willful and deliberate, and Plaintiffs are entitled to statutory damages, as well as attorney fees and costs pursuant to 17 U.S.C. § 504 and 17 U.S.C. § 505.

### THIRD CAUSE OF ACTION

### UNFAIR COMPETITION

### (against all Defendants)

61.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

62.     The acts described above constitute unfair competition under New York law.  The acts include, but are not limited to misappropriation of trade secrets and tortious interference with contract.

63.     Defendants' acts were and are intentional and carried out for the purpose of competing unfairly with Plaintiffs.

64.     Plaintiffs have been damaged by Defendants' actions and are also suffering irreparable harm for which they have no adequate remedy at law.

65.     As a direct, proximate and foreseeable result of such unlawful conduct, Plaintiffs have suffered money damages in an amount to be determined at trial, but believed to be in the millions of dollars.

### FOURTH CAUSE OF ACTION

### UNUST ENRICHMENT

### (against all Defendants)

66.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

67.     Defendants' adoption, reproduction, and/or use of Plaintiffs' trade secrets and confidential and proprietary business information has unjustly enriched Defendants by giving them the benefit of Plaintiffs' highly sophisticated and valuable intellectual property, and depriving Plaintiffs of the "first to market" status that they earned and rightfully deserve.

68.     Plaintiffs have suffered irreparable harm and damages as a result of Defendants' acts and are suffering money damages in an amount not yet fully determined, but believed to be in the millions of dollars.

### FIFTH CAUSE OF ACTION

### BREACH OF CONTRACT

### (by aGQa, against Thorpe)

69.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

70.     As described above, Thorpe was and remains contractually bound to maintain aGQa's trade secrets and confidential information.

71.     In accordance with the Thorpe Employment and Proprietary Information Agreement, all rights in and to the works created by Thorpe both within and without the scope of his employment are aGQa's property.

72.     aGQa performed all of its obligations under its contract with Thorpe, the main component of which was paying him a salary.

73.     Thorpe has breached and will continue to breach his Employment and Proprietary Information Agreement by disclosing and continuing to disclose aGQa's trade secrets and confidential information.

74.     These acts by Thorpe have caused and will continue to cause aGQa damages in an amount not yet fully determined, but believed to be in the millions of dollars.

**SIXTH CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH CONTRACT**

**(by aGQa, against KGK)**

75.     Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

76.     The Thorpe Employment and Proprietary Information Agreement between aGQa and Thorpe is a valid and enforceable contract.

77.     Even if that written and fully executed contract did not exist, there would be an implied in fact and/or implied in law contract between Thorpe and aGQa, which would forbid the use of Thorpe of any of aGQa's trade secrets and confidential information.

78.     On information and belief, KGK has knowledge of the written and fully executed contract between Thorpe and aGQa, and had such a broad understanding and familiarity with Thorpe's role at aGQa that it also has knowledge of any implied in fact and/or implied in law term covering the confidentiality of aGQa trade secrets and proprietary information.

79.     KGK intentionally and knowingly induced Thorpe to come work for KGK, and intentionally and knowingly induced him to use his knowledge of aGQa's trade secrets to unfairly replicate aGQa's software and marketing products and services.

80.     As a direct, proximate and foreseeable result of such conduct, aGQa has suffered money damages in an amount to be determined at trial, but believed to be in the millions of dollars.

**SEVENTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**(by aGQa, against Thorpe)**

81.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

82.     As an employee of aGQa, Thorpe owed aGQa certain fiduciary duties, including good faith and loyalty, which in turn include a duty not to disclose aGQa's trade secrets and confidential information.

83.     Thorpe breached this duty by misappropriating aGQa's trade secrets and confidential information.

84.     As a direct, proximate and foreseeable result of such conduct, aGQa has suffered money damages in an amount to be determined at trial, but believed to be in the millions of dollars.

**JURY DEMAND**

85.     Plaintiffs hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants as follows:

1.     Granting Plaintiffs preliminary and permanent injunctive relief, as follows:

    a.     Thorpe and KGK shall not work together for a period of one year;

    b.     Thorpe shall not work at any jewelry or marketing company where his role

would be substantially similar to his role with Plaintiffs;

   c.  Thorpe shall not use any of Plaintiffs' trade secrets, copyrighted materials, or any other proprietary information;

   d.  Thorpe shall destroy all copies of any source, object, or other code, or other materials relating to Plaintiffs' software, business plans, strategy, or other trade secrets or confidential information, after preserving and providing a copy of same to his attorney, subject to "attorney's eyes only" restrictions, to be held by his attorney during the course of this litigation and until directed otherwise by this Court;

   e.  Thorpe shall return all other Plaintiff property;

   f.  KGK shall destroy all information it has unlawfully received as a result of its collaboration with Thorpe;

   g.  Defendants, and all those acting in concert and participation with them, are prohibited from, directly or indirectly, utilizing, divulging, copying, cloning, recreating and/or modifying Plaintiffs' confidential and proprietary information and/or trade secrets, including but not limited to Plaintiffs' source and object codes and other computer codes, computer programs and software, algorithms, strategic plans, customer information and any and all documents, computer files, computer diskettes, or information that Defendants may have derived from Plaintiffs' confidential and proprietary information and/or trade secrets; and

   h.  Defendants are ordered to preserve and retain, and are enjoined from destroying, deleting, transferring or modifying in any way, all documents, tangible items and information (including information stored electronically), whether in their custody or control or the custody or control of their lawyers, agents, family members, friends, or any other person representing them or acting on their behalf: (i) that relate to Plaintiffs or any

affiliated entities; or (ii) that otherwise relate to the subject matter of this dispute.

2.      Awarding Plaintiffs damages and prejudgment interest against Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in the millions of dollars, plus punitive damages to punish Defendants for their intentional misconduct;

3.      Awarding Plaintiffs such statutory, exemplary or punitive damages as the Court deems just and proper;

4.      Awarding Plaintiffs their attorneys' fees and costs incurred in connection with this action; and

5.      Awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
       June 1, 2012

                                        A.E. ENGEL & ASSOCIATES, LLC

                                        By: _____
                                            Adam E. Engel (AE-9146)

                                        1040 Avenue of the Americas – 24th Floor
                                        New York, NY 10018
                                        (212) 665-8095

                                        Attorneys for Plaintiffs
                                        Accurate Grading Quality Assurance, Inc.
                                        and
                                        Electronic Sales Dealer Network, Inc.